UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Docket no. 2:19-cr-00155-GZS |
| DUSTIN BEACH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Dustin Beach's Motion to Suppress (ECF No. 49). Having considered the parties' evidence, stipulations (ECF No. 65), and arguments (ECF Nos. 49, 54 & 55),[1] the Court DENIES the Motion for the reasons described herein.

**I.   FACTUAL FINDINGS**

   **A.  Interview #1 – July 25, 2019**

On July 25, 2019, Dustin Beach was arrested and taken to the Lewiston Police Station.[2] At 3:47 AM, he was placed into an interview room with his hands handcuffed behind his body. (Stipulation (ECF No. 65), PageID # 142; Gov't Ex. 1, 00:00:42.)  Initially concerned that Beach might vomit, an officer provided him a trash can.  While he was alone in the room, Beach was able to open the door and communicate with officers outside the room.  Beach made several complaints about the tightness of his restraints, which were eventually adjusted to some degree of satisfaction after an hour and twenty minutes. (Gov't Ex. 1, 01:22:00).  After he had been in the interview

---

[1] This Motion has been briefed while the Court has had limited in-person hearings due to the ongoing COVID-19 pandemic.  In lieu of a video hearing or further delay associated with scheduling an in-person hearing, both Defendant and the Government have agreed to submit this matter for decision via a stipulated record.  See ECF No. 65.

[2] The parties have stipulated to the Court's review of Defendant's arrest record.  See ECF No. 65, PageID # 142.  As relevant here, Defendant had already built a considerable history of arrests across multiple jurisdictions despite being just 25 years old at the time of the events described herein.

room for about three and a half hours, officers entered the room, shifted Beach's restraints to the front of his body, and offered to get him a drink. (Id., 03:37:00.) Shortly thereafter, an officer dropped off water and food. (Id., 03:42:00.)[3]

At 8:07 AM, Lewiston Police Detective Brian Rose and FBI Special Agent Patrick Clancy entered the room to interview Beach. (Id., 04:20:00; Stip., PageID # 143.) Roughly 45 seconds into the interview, Detective Rose asked Beach about his education level and literacy and then commenced to read him his Miranda[4] rights from the "Lewiston Police Department Statement Form." (Gov't Ex. 1, 04:20:42; see also Def. Ex. 1 (ECF No. 49-1), PageID # 102.) After reading each right, Detective Rose asked Beach if he understood what had been read, which Beach confirmed. (Gov't Ex. 1, 04:20:42–04:22:00.)

After Detective Rose finished reading, he passed Beach the form. (Id., 04:22:40.) Beach reviewed the form and the following exchange ensued:

> Beach: That's a waiver of rights. Why would I want to sign my rights away?
> Rose: Well, that's totally up to you.
> Beach: No, why would I want to do that?[5]
> Rose: Ok.
> Clancy (two seconds later): Are you okay with talking to us?
> Beach: About what? I mean, I don't even know why the f—k I'm here.
> Clancy: That's what we want to find out. Like, what brings you to Maine?

(Id., 04:22:40–04:23:08.)

---

[3] Beach also complained that he was cold. Gov't Ex. 1, 02:11:00 & 03:39:00. He was offered a sweatshirt during the first round of questioning described herein, which he refused at the time, id., 04:39:40, though he accepted a blanket shortly thereafter, id., 05:10:00.

[4] Miranda v. Arizona, 384 U.S. 439 (1966).

[5] Several suggestions for what Defendant said here are offered by the parties, each somewhat changing the statement's effect. In Defendant's Motion and transcript offered to assist the Court's review, he suggests that his statement was a definitive "No. Why would I want to do that." Mot., PageID # 96; Def. Ex. 5 (ECF No. 55-2), PageID # 124. The Government, in its Objection, suggests that the statement was "No, why would I want to do that?" Gov't Obj. (ECF No. 54), PageID # 111. By contrast, in its assisting transcript, the Government suggests Defendant may have asked "Oh. Why would I want to do that?" Gov't Ex. 2, Page 007. Upon its own review of the evidence, the Court finds the version above best represents the statement and that Defendant posed a question to the officers, if perhaps a rhetorical one.

From that point, the conversation continued in a back-and-forth manner for another 25 minutes, with Beach voluntarily answering questions about the timeline of his trip to Maine and his association with A.B.[6]  (Id., 04:23:00–04:49:00.)  When Beach asked to use the bathroom, the interview stopped and he was immediately taken to the bathroom.  Thereafter, Beach was provided with a blanket and taken to the bathroom two additional times in response to his requests.  (Id., 04:49:00–05:33:00.)  Beach addressed several questions to the unidentified officer[7] who provided the blanket and accompanied him on these trips.  The officer largely deferred and explained that Rose and Clancy would be returning.  (Id.)

Three hours after Rose and Clancy left, a different officer entered the interview room and questioned Beach for roughly three minutes.  (Id., 07:49:00–07:52:11.)  Approximately twenty minutes later, Agent Clancy returned with an officer he introduced as "Tyler."  (Id., 08:12:10.)  Clancy and Tyler questioned Beach for about an hour before departing.  (Id., 08:12:00–09:19:00.)  Roughly half an hour later, Clancy and Tyler returned again and informed Beach that he was to be charged.  (Id., 09:45:00.)  From that point, the officers spoke to Beach for about twenty more minutes.  (Id., 09:45:00–10:04:00.)[8]  Shortly after—at 1:57 PM—Beach was escorted out of the interview room.  (Id., 10:10:00; Stip., PageID # 143.)

### B. Interview #2 – August 1, 2019

A week after his initial arrest, Agent Clancy and a second agent, Christopher Peavey, arrested Beach on the then-pending federal criminal complaint and transported him in restraints

---

[6] As noted in the Superseding Indictment (ECF No. 32) and the Complaint (ECF No. 1), "A.B." is the alleged victim of the kidnapping and interstate stalking charged in this case.

[7] This individual is listed as "Grey Suit" in Gov't Ex. 2.

[8] In his Motion, Defendant contends that Agent Clancy "engage[d] [him] in conversation for about four hours."  Mot., PageID # 96.  The Court's review has revealed that, cumulatively, questioning seems to have occurred over about two hours.

from the Androscoggin County Jail to the Edward T. Gignoux United States Courthouse in Portland for his initial appearance. (Gov't Ex. 3.)

Approximately seven minutes into the trip, following a brief stopover at the Lewiston Police Station, Agent Clancy informed Beach of the purpose of their trip and the current charge he was facing, namely, kidnapping. (Id., 00:07:21–00:07:57.) In response, Beach asked if his state charges had been dismissed, which Clancy confirmed. Beach expressed relief at this and then questioned why he was facing the kidnapping charge, asserting that A.B. accompanied him voluntarily. (Id., 00:07:58–00:09:12.)

The agents informed Beach that they had inculpatory evidence, and Beach responded that he had attempted to drop A.B. off in New Jersey, but she had refused. (Id., 00:09:12–00:09:37.) At this point, the agents stopped Beach and told him they were going to advise him of his rights before continuing the conversation. Before proceeding, they asked Beach if he was willing to answer questions, and he replied that it "depend[ed] on the question." (Id., 00:10:05–00:10:11.) The agents then advised Beach of his Miranda rights. After each right was read, Beach confirmed that he understood, and at the end of the recitation he confirmed that he understood all of his rights. (Id., 00:10:12–00:10:35.)

The agents then directly asked Beach if he was willing to waive his rights, leading to the following exchange:

> Beach: Am I willing to waive those rights?
> Peavey: What I mean is, you can stop questioning at any time. So you could --
> Beach: At any time in our conversation I could choose to --
> Peavey: Answer, not answer, stop talking.
> Beach: I understand that completely.

(Id., 00:10:36–00:10:52.)

The agents then prompted Beach to continue the prior conversation, explaining that they had not wanted to get too far "into the weeds" without reading him his rights. Beach agreed that "there's rules that got to be played by." (Id., 00:10:53–00:11:06.)

Beach then stated that it felt terrible being charged "with something like that." The agents told Beach that they knew A.B. was not injured prior to traveling with him. Beach responded that he did not know what the agent was talking about and he had already given a contrary account. The agents acknowledged that Beach had given such an account. Beach insisted that he and A.B. had simply packed up and left. The agents again maintained A.B. was not injured prior to the trip, and they asserted that they had a witness who would testify to that effect. (Id., 00:11:07–00:11:35.) From that point, the conversation continued roughly an additional 43 minutes in a back-and-forth manner, addressing a variety of topics including but not limited to an outstanding South Carolina warrant; A.B.'s mental health and possible motivations; and other events and circumstances relating to his arrival in Maine and subsequent arrest. (Id., 00:11:36–00:54:33.)

A week later, Agents Clancy and Peavy filed a report on the conversation. (Def. Ex. 3 (ECF No. 49-3, PageID #s 104–05.) As relevant here, the agents recorded the following version of events:

> SA Peavey read aloud from an advice of rights form. After each right was read to him, Beach verbally confirmed he understood the right. Beach confirmed he understood all the rights, and asked if Beach was willing to waive those rights and talk to investigators. *Beach advised he was not willing to waive the rights.* SA Peavey explained that Beach could stop questioning at any time. Beach asked if at any time during the conversation he could choose to not answer and stop talking. SA Peavey responded affirmatively. Beach stated he understood "that completely."

(Id. (emphasis added).) On October 16, 2020—roughly a year after this interview—Agent Peavey filed a revised report, stating that, based on review of the audio recording and the agents' own recollection, they should have written "Beach asked about the meaning of waiving those rights," rather than "Beach advised he was not willing to waive the rights," which was erroneous. (Gov't

5

Ex. 5.) Having reviewed the audio recording, the Court agrees that this revision accurately describes the exchange and the original report was erroneous.[9]

## II. DISCUSSION

Defendant seeks suppression of "his response to the questioning on July 25 and August 1, 2019 as a result of law enforcement questioning in violation of Miranda, and the 5th Amendment." (Mot., PageID # 94.) Defendant asserts that, in both cases, he indicated his unwillingness to waive his right to remain silent, yet questioning continued, thereby violating Miranda. The Government counters that, in both interviews, Defendant failed to unambiguously invoke his Miranda rights and his waiver of those rights was implied. (Gov't Opp., PageID #s 112–14.)

Under the Miranda doctrine, the Court is generally required to suppress any "statements obtained through custodial interrogation unless the police officer informed the suspect of his right to remain silent . . . ." United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998). If a defendant makes an unambiguous and unequivocal invocation of the right to remain silent, further questioning must cease. Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). Further, as the Supreme Court explained in Thompkins: "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement." Id. (internal quotation marks omitted).

However, in Thompkins, the Court also held that "waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." Id. at 383. "[F]ull comprehension of the

---

[9] Defense counsel has likewise observed that the recording does not support the version of events described in the original report: "In the agent's report of the August 1, 2019 interview, the officers write, 'Beach advised he was not willing to waive the rights.' Exhibit 3. Counsel are not hearing this in the audio recording." Def. Reply (ECF No. 55), PageID # 119.

rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process."[10] Id. at 382 (internal quotation marks omitted). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." United States v. Simpkins, 978 F.3d 1, 11 (1st Cir. 2020) (quoting Thompkins, 560 U.S. at 384). "Generally, courts have found implied waiver when a warned suspect has made incriminating statements 'as part of a steady stream of speech or as part of a back-and-forth conversation with the police,' or when a warned suspect who previously invoked his right 'spontaneously recommences the dialogue with his interviewers.'" Thompkins, 560 U.S. at 399 n.4 (quoting Bui v. Dipaolo, 170 F.3d 232, 240 (1st Cir. 1999)).

The First Circuit has recently reaffirmed that it is "bedrock[] [that] an accused who wishes to invoke his right to remain silent must do so in an unambiguous manner." Simpkins, 978 F.3d at 12. This point is important; not least because "[p]olice may interrogate a suspect who has neither invoked nor waived his or her Miranda rights." Thompkins, 560 U.S. at 388. In other words, only an unambiguous invocation, rather than a mere statement of nonwaiver, requires law enforcement to cut off questioning.

### A. Interview #1

As to the first interview, upon being presented the "Lewiston Police Department Statement Form," Defendant stated: "That's a waiver of rights. Why would I want to sign my rights away?" After Detective Rose responded that it was entirely Defendant's choice, Defendant replied: "No, why would I want to do that?" (Gov't Ex. 1, 04:22:40–04:23:08.)

---

[10] The right to consult an attorney has not been raised.

While Defendant has focused on these statements, the Court concludes that they are not unambiguously an invocation. First, courts have directly held that even an unequivocal refusal to sign a waiver of rights form is "not necessarily equivalent to an unambiguous decision to *invoke* them." United States v. Plugh, 648 F.3d 118, 125 (2d Cir. 2011);[11] see also Smith v. Illinois, 469 U.S. 91, 98 (1984) (per curiam) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."); United States v. Speaks, 453 F.2d 966, 968–69 (1st Cir. 1972) (finding valid waiver where defendant refused to sign a waiver of rights to remain silent but stated that he fully understood his rights and wanted to speak with the agent).[12] Nothing in what Defendant said plainly represented an affirmative attempt to invoke the right to remain silent. Rather, at most, Defendant appeared to express apprehension about "signing away" all of the rights described on the form. Second, by asking a question, Defendant invited the officers to further engage, an invitation that would seem to a reasonable officer contradictory to an unequivocal exercise of the right to remain silent. Cf. Davis v. United States, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might*

---

[11] Notably, Plugh vacated and reversed, pursuant to the holding in Thompkins, an earlier decision holding that such a refusal did bar questioning. See United States v. Oehne, 698 F.3d 119, 123 (2d Cir. 2012) (per curiam) (describing Plugh decisions).

[12] See also North Carolina v. Butler, 441 U.S. 369, 375 n.5 (1979) (noting that all contemporary circuit decisions had "rejected the . . . argument that refusal to sign a written waiver form precludes a finding of waiver"); United States v. Thurman, 889 F.3d 356, 365 (7th Cir. 2018) ("Refusal to sign a waiver form . . . is not enough to defeat credible evidence of an implied waiver."); United States v. Woods, 829 F.3d 675, 680 (8th Cir. 2016) (rejecting "argument that law enforcement officers were required to cease questioning . . . when [accused] refused to sign a waiver form"); United States v. Lawrence, 735 F.3d 385, 438 (6th Cir. 2013) ("Although [the accused refused to] sign the waiver form, he showed no reluctance to talk and did not invoke his rights to remain silent or to request an attorney."); United States v. Oliver, 630 F.3d 397, 409–10 (5th Cir. 2011) ("The mere refusal to sign a written waiver does not automatically render inadmissible all further statements made by the defendant. Indeed, [a] refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." (internal citations and quotation marks omitted)); United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010) ("[A]n arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of [the arrestee's Miranda] rights." (internal quotation marks omitted)).

be invoking the right to counsel, our precedents do not require the cessation of questioning"); United States v. Acosta, 363 F.3d 1141, 1154 (11th Cir. 2004) (explaining that although suspect's statement "'No, I'm not going to waive my right' . . . might well have been clear enough" to invoke his Miranda rights, the statement was ambiguous because the suspect immediately volunteered after making it that "I can collaborate, I can talk with you now . . ."). Faced with this ambiguity, Agent Clancy reasonably asked a clarifying question ("Are you okay with talking to us?").[13] See, e.g., James v. Marshall, 322 F.3d 103, 109 (1st Cir. 2003) ("[A] reasonable police officer . . . would have treated [defendant's] invocation of the right to remain silent as ambiguous, thereby justifying [a] clarifying question . . . ."). Defendant's immediate response to the clarifying question ("About what?") and subsequent choice to engage the officers in a back-and-forth conversation without any apparent hesitation can reasonably be interpreted as an implied waiver.[14]

---

[13] Alternatively, Defendant's answer might have been interpreted as a rhetorical question to which no response was truly invited. However, a reasonable officer, especially one aware of Defendant's extensive arrest history and, potentially, the consequences of making any damaging statements, would still have been justified in asking a clarifying question to understand his intent. Further, even assuming that a reasonable officer should have understood the question to be a mere rhetorical flourish, Defendant's statement still would not have constituted an unambiguous invocation of his Miranda rights given that his statement, on its face, concerned only the waiver form and he displayed no subsequent reluctance toward speaking at length.

[14] Defendant asserts that this case is comparable to United States v. Teemer, 260 F. Supp. 2d 187 (D. Me. 2003), in which an officer responded to a defendant's unambiguous invocation of his Miranda rights by stating that the defendant had a right to tell his own side of the story, that such a statement could potentially be helpful to the defendant, and, without defendant's statement, all the police would have to go on was adverse evidence. The Court finds Teemer distinguishable in several key respects. First, the court in Teemer found that an unambiguous invocation had occurred and all questioning should have ceased. Teemer, 260 F. Supp. 2d at 196–97. To be clear, this is not the Court's finding here. Second, Agent Clancy's clarifying question ("Are you okay with talking to us?") is distinguishable from the questioning in Teemer, which seems to have been cajoling at minimum and bordered on being argumentative. Defendant asserts that Agent Clancy should have reviewed Defendant's rights again instead of asking a question after Defendant's response, but Defendant had only just plainly confirmed he understood his rights. See, e.g., Plugh, 648 F.3d at 125 ("Miranda and its progeny impose no further burdens on law enforcement officers because once a defendant has been fully apprised of his rights, the law has no preference as between invocation and waiver." (internal quotation marks omitted)). Defendant also asserts that Clancy's next question ("Like, what brings you to Maine?") was "designed to elicit an incriminating response," Def. Reply, PageID # 119, but this strikes the Court as somewhat of an overstatement, and, in fact, it led most immediately to a brief discussion of the reasons people come to Maine, such as vacationing and sightseeing. Further, this question was invited by Defendant's own question ("About what?"). See also James, 322 F.3d at 109 (recognizing "Okay. Can I talk to you about what happened earlier tonight?" to be an acceptable clarifying question after ambiguous answer).

The Court notes that the alleged invocation in Simpkins was closer than what is before the Court here. There, the defendant asserted that he had invoked his Miranda rights by telling a state trooper more than once that he had "nothing to say." Simpkins, 978 F.3d at 12. The Circuit observed that, indeed, the defendant's use of the phrase could plausibly have meant "I don't wish to answer your questions," but it could also be "a convenient means of denying that he possessed any guilty knowledge." Id.; see also United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004) ("[W]ords are like chameleons; they frequently have different shades of meaning depending upon the circumstances.") (quoted in Simpkins). Accordingly, the Circuit found there was no unambiguous invocation. Simpkins, 978 F.3d at 12. Here, the Court finds that Defendant's even more debatable statements can fare no better.

Finally, in addition to finding that none of Defendant's statements constituted an unambiguous invocation, the Court further finds that his waiver was implied by his confirmation that he understood his Miranda rights and his decision to nonetheless engage with the officers. See id. at 11. His intervening refusal to sign a form, between affirming he understood his rights and speaking with notable volubility to the officers, did not, without more, invalidate his waiver. See, e.g., Speaks, 453 F.2d at 968–69; Note 12, supra. Accordingly, the Court finds that Beach knowingly and voluntarily made the statements he now seeks to suppress from the first interview.

### B. Interview #2

As to the second interview, there is no statement in the audio recording that can be construed as an invocation or even an expression of nonwaiver. Rather, Defendant confirmed that he "completely" understood his rights, commiserated with the agents that they had to play by a set of rules, and then engaged in a back-and-forth conversation with the agents. (Gov't Ex. 3, 00:10:36–00:11:06.) Given that Defendant confirmed that he understood his Miranda rights yet chose to speak with the agents, the Court concludes that Defendant's statements were made

knowingly and voluntarily and that Defendant's Miranda rights were impliedly waived. See Simpkins, 978 F.3d at 11.

### III.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 49) is DENIED.

SO ORDERED.

                                                /s/ George Z. Singal
                                                United States District Judge

Dated this 30th day of March, 2021.